UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA HOWARD,

                    Plaintiff,

        v.                                          Case No. 21-cv-643-pp

DYLON RADTKE, TONI DEBRUIN,
J. DINSE, SCOTT ECKSTEIN,
M. EITING and C. PEDERSEN,

                    Defendants.

## ORDER SCREENING COMPLAINT UNDER 28 U.S.C. §1915A

Joshua Howard, who is confined at Fox Lake Correctional Institution and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. The plaintiff has paid the full filing fee. This decision screens his complaint. Dkt. No. 1.

## I.    Screening the Complaint

### A.    Federal Screening Standard

Under the PLRA, the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case

1

under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.    The Plaintiff's Allegations

The plaintiff sues six defendants: Toni DeBruin, J. Dinse and C. Pedersen, who are staff members of Green Bay Correctional Institution's

Business Office; Scott Eckstein, former Green Bay warden; M. Eiting, supervisor of the business office; and Dylon Radtke, current Green Bay warden. Dkt. No. 1 at 1-2. The plaintiff begins by asserting generally that several members of Green Bay's business office "engaged in practices of retaliation by rejecting and/or delaying any requests or transactions relating to the plaintiff and also taking advantage of their role as trustees of the plaintiff's accounts and repeatedly breaching their fiduciary duty through dishonest and illegal conduct." Id. at 2 ¶1.

According to the plaintiff, the chain of events largely flows from the Department of Corrections' 2016 implementation of a unilaterally amended policy, DAI Policy 309.45.02, "under which they altered the rates that they collected court obligations from 25% of incoming funds to 50%." Id. at 2 ¶2. The plaintiff alleges that from 2002 to 2016, the DOC collected court costs and DNA surcharges at the rate of twenty-five percent of all incoming funds to his trust account and collected restitution at a rate of twenty-five percent of all incoming state pay, in compliance with Wisconsin Statute 973.05[1] and the order of his sentencing court, which specifically ordered that the restitution was to be "paid from up to 25% of [his] prison wages." Id. at 3 ¶¶5-6. But the

_____

[1] The plaintiff says that this statute "sets out the rate at which all court-ordered fines, costs and surcharges are collected, i.e., 'not more than 25% of the defendant's commissions, earnings, salaries, wages[.]' [Wis. Stat.] §973.05(4)(b)." He states, [t]his section specifically referenced restitution debts prior to the Legislature issuing a criminal statu[t]e-wide amendment to replace the repeated listing of each type of applicable debt to the all encompassing language of 'costs, fees and surcharges' in 2003 WI Act 139." Dkt. No. 1 at 2 ¶4.

3

plaintiff says that on April 4, 2016, DAI Policy 309.45.02 was amended to allow the institution trustees to collect all restitution, court costs, fines and surcharges at a rate of fifty percent of all incoming funds "with instructions to 'interpret' any conflicting orders on Judgments of Conviction (JOC) as allowing this change of rate of collection." Id. at 3, ¶7.

The plaintiff alleges that to "curb government agencies from having the unfettered ability to create and implement sections of administrative code at will, the Legislature passed 2011 Wisconsin Act 21, the Act, which laid out various steps an agency must follow before implementation of a rule." Id. at 3, ¶8. The plaintiff says that "[u]pon information and belief the Defendants were aware that the 2016 amendment of 309.45.02 was not implemented in accordance with the Act and accordingly was not legally enforceable." Id. at 3, ¶9.

The plaintiff explains that he filed a complaint under the Inmate Complaint Review System because the policy conflicted with Wis. Stat. §973.05 and with the specific order from his sentencing judge. Id. at 3, ¶10. He says that when the inmate complaint was dismissed, he appealed to the Dane County Circuit Court by way of a *certiorari* petition. Id. The plaintiff alleges that on February 1, 2018, the court reversed the DOC's decision on his inmate complaint, "finding that the DOC's conduct of superseding the sentencing judge's order amounts to a failure to follow the law." Id. at 4, ¶11.

The plaintiff alleges that his case "was one of two highly publicized decisions condemning the DOC's application of the amended policy, which led

to DOC business offices being flooded with hundreds of requests to discontinue the practice with citations to the plaintiff's case." Id. at 4, ¶12. The plaintiff alleges that it "took the Defendants only a few weeks to commit their first retaliatory act, which was to ignore the certiorari court's order." Id. at 4, ¶13. He asserts that in February 2018, the only income he had was $7.60 in "state pay;" he says that that month, the defendants collected twenty-five percent of that income and put it towards his restitution obligation, but that by March they resumed taking fifty percent "of state pay and incoming funds for restitution payments." Id.

The plaintiff goes on to describe several additional allegedly retaliatory actions the defendants took over the next almost two years. First, the plaintiff alleges that in July of 2018, he sent a disbursement request to the business office, asking it to send some money to his attorney; he says the defendants "denied his request after erroneously finding that his trust account contained insufficient funds." Id. at 4, ¶14. Next, he says that he had filed a motion "in the certiorari court" asking it to impose sanctions on the defendants for failing to comply with the February 1, 2018 order; he says in October 2018, he tried to pay the filing fee for that sanctions case. Id. at 4, ¶15. The plaintiff explains that on October 19, 2018, the court of appeals sent an order to the institution's business office authorizing them to send the $195 fee from either the plaintiff's trust or release account and required the business office to send the funds within thirty days. Id. at 4, ¶16. The plaintiff says that on October 22, 2018, he submitted a disbursement request asking that the fee be sent to the court of

appeals, but that the defendants denied the request stating that he needed to provide a copy of the court's order. Id. at 5, ¶17. The next day, the plaintiff sent another request and a copy of the court's order, which specifically indicated that the court had found the plaintiff to be partially indigent and stated that the court had authorized "access to all accounts as were necessary to pay the fee." Id. at 5, ¶18. The plaintiff says that "[d]espite this language, on 10.16.18[2] the defendants denied his request because he would need to deplete the funds in his general trust account before accessing the funds in his release account." Id. at 5, ¶19.

Third, the plaintiff asserts that on November 4, 2018, he submitted a disbursement asking to send a Notice of Injury form to the Attorney General by certified mail, as required by statute. Id. at 5, ¶20. He alleges that the next day, the defendants approved the disbursement, but didn't charge his account for the amount needed to pay for certified postage, instead sending the form by first-class mail. Id. at 5, ¶21. The plaintiff states that when he complained, "the defendants were unable to identify the signature of the person who approved the disbursement." Id.

Fourth, the plaintiff alleges that on November 14, 2018, he sent to the business office a disbursement and order form for a purchase from the DOC vendor catalog. Id. at 5-6, ¶22. Two days later, he requested that the order be

---

[2] The chronology seems off here; the plaintiff says he provided a copy of the court's order on October 23, 2018 and that the defendants refused his request on October 16, 2018—a week *before* the date on which he says he provided the court's order.

6

canceled. Id. at 6, ¶22. He says that the defendants allegedly processed the order and removed the funds from his account on November 20, 2018. Id. The plaintiff alleges that he filed a complaint about this and that when the inmate complaint examiner contacted the defendants, they claimed they never had received the cancellation request. Id. at 6, ¶23. The plaintiff alleges that on January 11, 2019, the institution complaint examiner recommended that his complaint be dismissed. Id. According to the plaintiff, the defendants did not process the canteen orders the plaintiff placed for the last two weeks of January and as a result, he went without food and supplies for nearly three weeks. Id. at 6, ¶25.

Fifth, the plaintiff alleges that on February 3, 2019, he wrote to the business office and requested legal loan applications for two filings that had ten-day deadlines. Id. at 6, ¶26. He says that the defendants did not send the applications to his cell hall until February 18, 2019, and that while he immediately applied for the $1.90 in legal loans, the defendants never posted the loans on his account but just deducted the amount a month later "without explanation." Id. at 6, ¶¶26-27.

Sixth, the plaintiff alleges that in April 2019, he tried to obtain a legal loan to mail out a certified notice of injury to the Attorney General within the statutory 120-day deadline. Id. at 6, ¶28. The plaintiff says that he submitted his initial request on April 3, 2019 "in a prepaid first-class envelope along with a DOC-1290 and a disbursement requesting a legal loan to send it out certified mail." Id. at 7, ¶29. The defendants initially approved the disbursement on

April 10, 2019, but then "crossed it out and returned it, stating that the plaintiff needed to reference the case number or provide a description of the filing." Id. at 7, ¶30. Although the plaintiff believed this was improper, on April 11, 2019 he nonetheless submitted another request for certified postage, and added that he was filing a "Notice of Claim" in "Howard v. Atkins." Id. at 7, ¶32. The plaintiff states that the defendants again initially approved the request, but then crossed out the charge; he says that on April 16, 2019, they returned the request, stating:

> Notice of claims are for new cases. This case has been filed with the court already, in addition the mailroom will not fill out the certified mail or return receipt. The inmate will need to do that.

Id. at 7, ¶33.

The plaintiff alleges that he complained about the April 3 request being returned, but the defendants told the inmate complaint examiner that they'd returned it because the plaintiff had submitted his disbursement at the same time he submitted his legal loan application (and not because they wanted more information). Id. at 7-8, ¶34. He says he complained about the April 11 request not being processed, and that "the defendants acknowledge that they returned it because they thought he was sending a notice of injury for the case that he had already filed against Dr. Atkins so it was returned to him;" the plaintiff speculates that the defendants were "aware that it was beyond their role to screen his legal filings," so they "added that it would have been returned anyway because the plaintiff had not filled out the postal forms." Id. at 8, ¶35.

The plaintiff says that after his second disbursement for certified postage

was returned on April 16, 2019, he "immediately sent a third submission which included a description of the filing and the postal forms," but he forgot to sign the disbursement. Id. at 8, ¶36. The plaintiff says that instead of "promptly" sending the form back to him for his signature, the defendants "held onto it for (3) weeks before sending it back;" when the plaintiff complained about it, "the defendants said the mailing had been misplaced for nearly a month." Id. at 8, ¶37. The plaintiff alleges that when he submitted his fourth request for postage, he wrote on the disbursement that he did not want a receipt, but the defendants charged him $3.45 for a return receipt. Id. at 8, ¶38.

Seventh, the plaintiff alleges that in April 2019, one of the defendants brought him a settlement agreement; the plaintiff signed it and that defendant left with the only copy (which the plaintiff presumes was going to be forwarded to the Attorney General or the Attorney General's lawyer). Id. at 8, ¶39. According to the plaintiff, the settlement agreement "required the DOC to forward a set amount of funds to the plaintiff's attorney and to cancel his legal loan debts from his trust account." Id. at 9, ¶39. He states that on April 19, 2019, the defendants removed $98.27 in obligations from his account. Id. The plaintiff alleges that in May 2019, he submitted applications for two legal loans. Id. at 9, ¶40. He says that one of his applications was for printing and sending copies of his opening appellate brief in 18-AP-1780. Id. He says the other application (submitted on May 21, 2019) was "for a certiorari filing to challenge a complaint against the defendants, which had a statutory (45) day deadline."

9

Id. at 9, ¶41. He says the loan was not approved until June 6, 2019. Id. He indicates that on June 7, 2019, he submitted a disbursement for a "certified copy of his account statement," but that it took the defendants another ten days to process that disbursement. Id.

The plaintiff says that in May 2019, he asked his lawyer to send him $850. Id. at 9, ¶42. He claims that the defendants "simultaneously" did not process his legal loan and application and did not deposit the money from his lawyer, because they were "intent on keeping [the plaintiff] destitute for as long as possible." Id.

According to the plaintiff, throughout May and June he was working on his opening brief in case 18-AP-1780; he says he saved it on his thumb drive. Id. at 9, ¶43. He says that on June 21, 2019 he sought a legal loan by submitting a disbursement to the librarian; he was going to use the loan to print the brief, but the librarian told him he didn't have a legal loan for case 18-AP-1780. Id. The plaintiff says that he asked the librarian to check with the defendants about the status of his application (which he'd submitted several weeks earlier); he says "they informed that it had not been approved." Id. at 9 ¶44. The plaintiff claims that "by this time the defendants had been in possession of his settlement check for several weeks," but that the check had not been deposited into his account so he wasn't able to print the brief. Id. at 9-10, ¶44. The plaintiff says that on June 26, 2019, he submitted another disbursement to the librarian for the purpose of printing the brief; she responded that he still had not been approved for a legal loan. Id. at 10, ¶45.

10

This time, he asked the librarian to call the defendants and ask "if they would approve the copies being charged as an overdraft which would be paid as soon as they deposited the check." Id. The plaintiff says that the defendants refused, "and the plaintiff was unable to meet the filing deadline for his brief." Id.

The plaintiff alleges that when he complained about the delay depositing his settlement check, "Defendant Eiting replied that they needed a copy of the settlement agreement before they could process it, despite the fact that when the plaintiff signed the agreement it had been brought to the cell hall by one of the defendants who left with the only copy." Id. at 10, ¶46. The plaintiff states that when the settlement funds still had not been deposited by the first week of July, he filed another complaint. Id. at 10, ¶47. He asserts that "[t]his time the defendants stated that they had received a 'settlement check' from the plaintiff's attorney but they needed confirmation about the case number before they could process it because the settlement agreement required that they deduct restitution from the settlement funds pursuant to the JOC rather than Policy 309.45.02." Id. The plaintiff alleges that another two weeks passed without the defendants depositing the settlement check, so he filed another complaint; the defendants finally deposited the check in the plaintiff's account on July 26, 2019. Id. at 10, ¶48. The plaintiff says he ended up borrowing money from family so that in early July, he could print the brief; he says that on July 26, 2019, he sent the brief to the defendants so that it could be mailed to the court to meet the extended due date, but that they did not send it out until August 6, 2019. Id. at 11, ¶49.

Eighth, the plaintiff alleges that on August 4, 2019, he attempted to order a document in case 98-cv-791 from the "Western District." Id. at 11, ¶50. He alleges that he submitted "an unsealed postage prepaid envelope which contained the form that he had received from the court when he enquired about ordering the document;" he says that he provided his name, case number a description of the document and the estimated cost on the form. Id. at 11-12, ¶50. The plaintiff also "attached" a disbursement asking the defendants to enclose a check for the estimated cost made out to the Clerk of Court at the address on the envelope; he says that in the "Items Requested" section of the disbursement, he indicated that he was ordering a court exhibit. Id. at 12, ¶51. According to the plaintiff, the defendants returned the form several times asking for more information; eventually, they returned the envelope, refusing to allow him to order the document. Id. at 11-12 ¶¶51-55. The plaintiff says he gave up trying to order the document and filed a complaint about the defendants' refusal to process his request. Id. at 12, ¶56. The defendants claimed that they returned the disbursement "because they needed more information despite the fact that the DOC-184 was fully and properly filled out." Id.

Ninth, the plaintiff alleges that on January 19, 2020, he was given a urinalysis test which showed a positive result for several drugs. Id. at 12, ¶57. The plaintiff allegedly was taken to segregation and told that if he wanted to have the sample sent to a lab for a more accurate test, he would be required to pay for it; if the test came back negative, he would be reimbursed. Id. The

12

plaintiff requested further testing and signed a disbursement for the fee; the sample was received by the lab on January 29, 2020 and on February 1, 2020, "it reported negative results for any drugs." Id. at 12 ¶¶57-58. Two days later, the defendants allegedly charged the plaintiff's account $10.50, even though by that time, the test had come back negative. Id. at 12, ¶59. They did not reverse the charge until March 4, 2020, after the plaintiff repeatedly wrote them about it. Id. at 12, ¶¶59-60.

Tenth, the plaintiff alleges that on March 31, 2020, he submitted a disbursement to the business office for the purchase of items sold by the property department. Id. at 13, ¶61. He says that on April 10, 2020, the defendants returned the disbursement stating that it needed to be verified by staff, "even though[] the verification rule had not yet been implemented." Id. at 13, ¶62.

The plaintiff claims that the defendants violated his rights under the First Amendment when they "conspired to retaliate against him by continuing to collect restitution from all funds at 50% and by repeatedly delaying, returning and/or rejecting any request he made to the business office with the goal of denying him access to funds and thwarting his intended objective every time they had the ability to do so." Id. at 13, ¶63. He also claims that the defendants breached their statutory and common-law duties as trustees of his prison accounts, by: (1) repeatedly ignoring the lawful order of the sentencing court and seizing more than twenty-five percent of state pay and fifty percent of gifted funds; (2) applying the post-2016 amended version of DAI Policy

13

309.45.02 to the plaintiff's accounts, fully aware that it had not been lawfully implemented pursuant to Act 21 and the WI Administrative Procedure Act; (3) failing to comply with the order of the *certiorari* court which affirmed the legality of the sentencing court's order that restitution be collected at the rate of 25% of state pay; and (4) failing to inform the plaintiff that the DOC had not lawfully enacted the new rule in the amended version of 309.45.02 and illegally diverting several hundred dollars from his general account. Id. at 13-14 ¶¶64-65.

The plaintiff seeks declaratory, nominal, compensatory and punitive damages. Id. at 14.

C.     Analysis

To plead a retaliation claim, the plaintiff must allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." Perez v. Fenoglio, 792 F.3d 768, 783 (7th Cir. 2015) (quoting Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009)).

The plaintiff filed an inmate complaint and after its dismissal, he filed a petition for a writ of *certiorari* to the Dane County Circuit Court. The plaintiff has sufficiently alleged the first element of a retaliation claim; he has a First Amendment right to file prison grievances and to petition for redress of grievances by filing nonfrivolous claims in court. See Bridges, 557 F.3d at 553.

14

As for the second element, the court applies an objective test: whether the defendants' alleged conduct would likely deter a person of ordinary firmness from continuing to engage in protected activity. Douglas v. Reeves, 964 F3.d 643, 646 (7th Cir. 2020) (quoting Surita v. Hyde, 665 F.3d 860, 878 (7th Cir. 2011)). Whether retaliatory conduct is sufficiently severe to deter is generally a question of fact, although the court may resolve the issue as a matter of law when the asserted injury is truly minimal. Id. at 647 (citing Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)). The court presumes that the plaintiff's allegations that beginning in March 2018, the defendants unlawfully took fifty percent of his state pay satisfies this standard. Most of the plaintiff's ten other examples of retaliation, as enumerated above, likely do not meet that standard. The court will not, however, dismiss them at this time.

The third element of a claim for retaliation under the First Amendment requires a plaintiff to show that the adverse action he suffered was motivated by his protected conduct. See Massey v. Johnson, 457 F.3d 711, 716-17 (7th Cir. 2006). "[A] motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's action." Spiegla v. Hull, 371 F.3d 928, 942 (7th Cir. 2004). Although it is not entirely clear, it appears that the plaintiff alleges that the first instance of retaliation occurred in March 2018, in response to the Dane County Circuit Court's reversal of the DOC's dismissal of the plaintiff's inmate complaint. Dkt. No. 1 at 4. According to the plaintiff, in February 2018, the defendants correctly collected twenty-five percent of his $7.60 in state pay and put it toward his

15

restitution obligation, but by March they resumed taking fifty percent of state pay and incoming funds for restitution payments. Id. The plaintiff goes on to describe continued retaliation by all defendants, beginning in July 2018 and continuing until April 2020. It appears that the plaintiff alleges that all the defendants' collective actions were in retaliation for his inmate complaint and/or *certiorari* petition.

While the plaintiff has alleged the elements of a retaliation claim, he has not alleged the personal involvement of any defendant; he repeatedly alleges that "the defendants" or "a defendant" took various actions. It is not plausible that all six defendants were personally involved in each of the incidents described above. Section 1983 limits liability to public employees who are personally responsible for a constitutional violation. Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009). For liability to attach, the individual defendant must have caused or participated in a constitutional violation. Hildebrandt v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003). As to supervisors, the personal responsibility requirement is satisfied if the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent. Id. In other words, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." Id. (quoting Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)).

This is not a case where the plaintiff has been injured as the consequence of the actions of an unknown member or members of a collective body. See, *e.g.*, Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 821

(7th Cir. 2009). The plaintiff knows the defendants' names and he has provided detailed information about his allegations. To state a claim, the complaint must contain factual content that supports a reasonable inference that the named defendants are liable for the harm. Iqbal, 556 U.S. at 678. Again, it is not plausible that all six defendants had personal involvement in each of the alleged incidents; in fact, in one case, the plaintiff states that "one of the defendants" brought him the settlement and went away with the only signed copy. Because the plaintiff has not alleged that any individual defendant had personal involvement in his complaint allegations, or identified which individual defendants were involved in which of the alleged incidents and in what way, and because there is no indication that he does not know this information, the complaint fails to state a claim.

Finally, the plaintiff appears to want to allege a conspiracy among the defendants. Dkt. No. 1 at 13, ¶63. However, a "bare allegation" of a conspiracy does not state a claim. See, e.g., Cooney v. Rossiter, 583 F.3d 967, 970–71 (7th Cir. 2009); Ryan v. Mary Immaculate Queen Center, 188 F.3d 857, 860 (7th Cir. 1999).

The court will give the plaintiff an opportunity to file an amended complaint describing the personal involvement of each of the defendants. When writing his amended complaint, the plaintiff should provide the court with enough facts to answer the following questions: 1) Who violated his constitutional rights?; 2) What did each person do to violate his rights?; 3) Where did each person violate his rights?; and 4) When did each person violate

17

his rights? The plaintiff's amended complaint does not need to be long or contain legal language or citations to statutes or cases, but it does need to provide the court and each defendant with notice of what each defendant allegedly did or did not do to violate his rights.

The court is enclosing a copy of its amended complaint form. The plaintiff must write the word "Amended" at the top of the first page of the form, before the word "Complaint." He must list the case number for this case on the first page. He must list all the defendants he wants to sue in the caption of the amended complaint. He should use the spaces on pages two and three to explain the key facts that give rise to the claims he wishes to bring, and to describe which defendants he believes committed the violations that relate to each claim. If there is not enough space on those pages, the plaintiff may use up to five additional sheets of paper, double-spaced so that the court can read them. The amended complaint takes the place of the prior complaint and must be complete in itself; the plaintiff may not refer the court back to his original complaint, rather than repeating in the amended complaint any of the facts from the original complaint that are necessary to his claims.

## II.  Conclusion

The court **CONCLUDES** that the plaintiff's complaint fails to state a claim. Dkt. No. 1.

The court **ORDERS** that the plaintiff may file an amended complaint that complies with the instructions in this order. If the plaintiff chooses to file an amended complaint, he must do so in time for the court to *receive* it by the

18

end of the day on **September 30, 2022**. If the plaintiff files an amended complaint in time for the court to *receive* it by the end of the day on September 30, 2022, the court will screen the amended complaint as required by 28 U.S.C. §1915A. If the plaintiff does not file an amended complaint in time for the court to receive it by the deadline, the court will dismiss this case based on the plaintiff's failure to state a claim in his original complaint and will issue him a strike as required by 28 U.S.C. §1915(g).

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[3] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS.  It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the

---

[3] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

Clerk of Court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing this case without further notice.

Dated in Milwaukee, Wisconsin, this 6th day of September, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**