UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA HOWARD,

                           Plaintiff,

        v.                                      Case No. 21-cv-643-pp

DYLON RADTKE, TONI DEBRUIN,
J. DINSE, SCOTT ECKSTEIN,
M. EITING, C. PEDERSEN
and DIRECTOR MONFILS,

                           Defendants.

**ORDER SCREENING AMENDED COMPLAINT (DKT. NO. 7) AND DENYING
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 8)**

        Plaintiff Joshua Howard, who is incarcerated at Fox Lake Correctional

Institution and is representing himself, filed this case alleging that the

defendants violated his rights after he complained about the defendants'

retaliatory enforcement of a policy under which they withdrew fifty percent of

his incoming funds for restitution, court costs and fines. Dkt. No. 1. The court

screened the complaint under 28 U.S.C. §1915A and determined that the

complaint did not state a claim because the allegations in the complaint did

not allege the personal involvement of any defendant. Dkt. No. 4 at 16. The

court dismissed the complaint for failure to state a claim, but gave the plaintiff

an opportunity to file an amended complaint describing the defendants'

personal involvement. Id. at 17. The plaintiff has filed an amended complaint,

dkt. no. 7, and a motion for preliminary injunction, dkt. no. 8. This order

1

screens the amended complaint and denies the plaintiff's motion for preliminary injunction.

## I.     Screening the Amended Complaint

### A.     Federal Screening Standard

Under the Prison Litigation Reform Act, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable

2

inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.    The Plaintiff's Allegations

The plaintiff has sued Toni DeBruin, J. Dinse, and C. Pedersen, who work in the business office at Green Bay Correctional Institution; M. Eiting, a supervisor in the Green Bay's business office; Scott Eckstein and Dylon Radtke, who are or were the warden and trustee of Green Bay; and Monfils, who is the business director of the Wisconsin Department of Correction ("DOC") Division of Adult Institution ("DAI"). Dkt. No. 7 at 1-2.

1.    *Background*

The plaintiff alleges that a Wisconsin statute (Wis. Stat. §973.05) sets the rate at which all court-ordered fines, costs and surcharges are collected, *i.e.*, "not more than 25% of the defendant's commissions, earnings, salaries, wages[.]" Dkt. No. 7 at ¶6. The plaintiff states that when he was sentenced in

3

2002, the court ordered him to pay his court costs and DNA surcharge obligation at a rate of 25% and in 2004, the court specifically ordered that his restitution obligation "was to be paid from up to 25% of prison wages." Id. at ¶7.[1]

According to the plaintiff, in 2016 the DOC amended DAI Policy 309.45.02 to modify the rate at which the DOC collects court obligations from 25% to 50% of incoming funds. Id. at ¶2. He asserts that the DOC amended the policy after the Wisconsin legislature passed "Act 355," which amended the state restitution statute to specifically confer on the DOC the authority to set a reasonable rate of collection of restitution, stating:

> If a defendant who is in a state prison or who is sentenced to state prison is ordered to pay restitution, the court shall require the defendant to authorize the department to collect, from the defendant's wages and from other moneys held in the defendant's prisoners account, an amount or percentage the department determines is reasonable for payment to victims.

Id. at ¶¶12-13. The plaintiff alleges that even though the DOC received authorization from the legislature to set a reasonable rate of restitution starting in April 2016, the DOC did not legally amend DAI Policy 309.45.02 because it did not take the steps required by the Wisconsin Administrative Procedure Act ("WAPA") and "2011 WI Act 21." Id. at ¶14. The plaintiff alleges, "[u]pon information and belief," that the defendants were aware that the 2016

---

[1] The plaintiff states that in 2003 Wis. Act 139, the legislature sought to replace the practice of listing every type of obligation in each applicable statute with the all-encompassing language of "costs, fees and surcharges," and that prior to this change of language, "restitution" was included as one of the obligations that were capped at 25% under the statute. Dkt. No. 7 at ¶6.

amendment to DAI Policy 309.45.02 was not implemented according to WAPA and that Act 21 and was not legally enforceable. Id. at ¶15. The plaintiff also alleges, "[u]pon information and belief," that the defendants were aware that they did not have the legal authority to: (1) set the rate of collection for court costs and surcharges, (2) to retroactively apply the authority granted by Act 355, and (3) to disregard the rate of collection set by the sentencing courts. Id. at ¶16.

The plaintiff alleges that he filed an "ICRS [Inmate Complaint Review System] complaint" challenging the DOC's ability to retroactively apply Act 355 in conflict with the order of the sentencing court and to collect costs and surcharges at a rate exceeding the 25% cap set in §973.05. Id. at ¶17. He states that his ICRS complaint was dismissed, and the DOC found that his obligations were being collected in accordance with DAI Policy 309.45.02. Id. at ¶18. The plaintiff allegedly filed a *certiorari* appeal in Dane County Circuit Court and on February 1, 2018, the court reversed the DOC, stating:

> Here, the DOC received an order requiring it to collect from Petitioner funds for surcharges and restitution at a rate of 'up to 25%.' The DOC, aware of the court order, instead collected at a rate of 50%. This amounts to a failure to follow the law.

Id. at ¶19. The plaintiff asserts that this decision resulted in a flood of requests to DOC business offices and complaints throughout the DOC by similarly situated incarcerated individuals, citing the plaintiff's decision as grounds to treat them accordingly. Id. at ¶20. The plaintiff alleges that in February 2018 the Green Bay business office deducted 25% of his state pay and applied it toward his restitution obligation. Id. at ¶21.

5

2. *Retaliation Allegations*

The plaintiff alleges that the next month, in March 2018, deductions of 50% resumed. Id. at ¶23. He says that after he filed an ICRS complaint about it, DeBruin and Monfils falsely claimed that the deductions were proper under a newly amended "JOC" (judgment of conviction) issued on February 17, 2018, which negated the *certiorari* court's ruling because it allowed them to deduct 50%. Id. at ¶¶23-24. The plaintiff allegedly asked "records" for a copy of the new judgment of conviction, and they replied that the newest judgment of conviction was issued in 2017. Id. at ¶25. The plaintiff alleges that Monfils and DeBruin conspired and agreed to revert to collecting 50% based on a fictitious amended judgment of conviction to retaliate against him for successfully challenging the DOC. Id. at ¶26. He also alleges that "this policy could not have been implemented without the knowledge and consent of Trustees Eckstein and Radtke" and that, "[b]ased on this retaliatory policy, between 2018 and 2021, there were over (100) improper deductions of restitution collected from the Plaintiff's trust account." Id. at ¶27. The plaintiff further alleges, upon information and belief, that "Eiting, DeBruin, Dinse and Pedersen were aware that the policy was based upon a fictitious JOC and not only approved of the retaliation but also personally participated in the improper deductions." Id. at ¶28.

3. *Subsequent Alleged Retaliatory Conduct*

The plaintiff alleges that the defendants subsequently engaged in the practice of delaying and denying every request he sent to the business office in

6

retaliation for his repeated complaints and lawsuits against the DOC. Id. at
¶30. He states that every legal mailing and disbursement request goes through
the business office and that Eiting, Pedersen, DeBruin and Dinse implemented
an "unconstitutional policy and custom" of retaliating against litigants by
delaying, denying and/or losing their submissions whenever it was possible for
them to do so. Id. at ¶31. Radtke and Eckstein allegedly were aware of the
business office's unconstitutional practice, and they allowed it to proceed. Id.
at ¶32. The plaintiff describes ten alleged retaliatory acts committed under this
"unconstitutional policy and custom."

First, he says that after he filed a motion in the *certiorari* court seeking
sanctions because of the defendants' failure to comply with the court's order, in
October 2018 he tried to pay the filing fee. Id. at ¶34. The plaintiff alleges that
on October 19, 2018, the court of appeals sent a copy of an order to the
business office authorizing the $195 fee to be sent from the plaintiff's general
and/or release account and that three days later the plaintiff submitted a
disbursement seeking to send the filing fee to the court of appeals. Id. at ¶¶35-
36. The next day, DeBruin allegedly denied the plaintiff's request stating that
the plaintiff needed to supply a copy of the order from the court authorizing the
release of funds from his release account. Id. at ¶36. That same day, the
plaintiff allegedly submitted a second request along with a copy of the court's
order which stated that it authorized access to all accounts as necessary to pay
the fee. Id. at ¶37. The plaintiff says that despite this language, Dinse denied

his request because the plaintiff would need to deplete the funds in his general trust account before accessing the funds in his release account. Id. at ¶38.

Second, the plaintiff alleges that on November 4, 2018, he submitted a disbursement request to send a notice of injury form to the attorney general via certified mail, as required by statute. Id. at ¶39. He says that the next day his disbursement was approved but "they" did not charge his account for certified postage, and they sent the form using first class mail. Id. at ¶40. When the plaintiff complained, the defendants allegedly were unable to identify the signature of the person who approved the disbursement (despite the fact, the plaintiff says, that this person had processed several of his disbursements). Id.

Third, the plaintiff alleges that on November 14, 2018, he sent a disbursement and order form to the business office so that he could order property from the DOC vendor catalog. Id. at ¶41. Two days later, he allegedly wrote and requested that the order be cancelled but DeBruin ignored his request and processed the order on November 20, 2018. Id. The plaintiff states that when Debruin was contacted later by the institution complaint examiner, she claimed not to have received the plaintiff's cancellation request. Id. at ¶42.

Fourth, the plaintiff alleges that the business office processes the weekly canteen orders and the orders placed by the plaintiff for the last two weeks of January were not processed, which resulted in the plaintiff going without food and supplies for nearly three weeks. Id. at ¶44. The plaintiff states that he complained after each order was not processed. Id. In response to the first complaint, DeBruin allegedly stated that the ordering date had been changed

8

that week and the complaint was dismissed even though the date change did not negatively impact the plaintiff's order. Id. at ¶45. In response to the second complaint, DeBruin allegedly stated that there was a glitch in the computer which caused the plaintiff's orders not to be processed. Id. Upon information and belief, the plaintiff alleges that DeBruin intentionally failed to process the plaintiff's canteen orders in response to his complaints about her failing to cancel his vendor catalog order. Id. at ¶46.

Fifth, the plaintiff alleges that on February 3, 2019, he requested from the business office legal loan applications for two ICRS filings that had ten-day deadlines. Id. at ¶47. DeBruin allegedly processed his requests three days later but did not forward them to the plaintiff's cell hall until February 18. Id. The plaintiff states that he immediately applied for legal loans, but DeBruin never posted the loans on his account and just deducted the amount a month later without explanation. Id. at ¶48.

Sixth, the plaintiff alleges that in April 2019 he tried to obtain a legal loan to mail out a certified notice of injury to the Attorney General. Id. at ¶49. The plaintiff alleges that on April 3, 2019, he submitted his notice of injury along with a disbursement requesting a legal loan to cover the certified mail fee. Id. at ¶50. On April 10, DeBruin allegedly returned the disbursement stating that the plaintiff needed to reference the case number or provide a description of the filing. Id. at ¶51. The plaintiff asserts that when he complained about this request not being processed, DeBruin told the complaint examiner that the request "was not returned because they wanted more

information but because the plaintiff had submitted his disbursement at the same time as his legal loan application." Id. at ¶54. The next day—April 11, 2019—the plaintiff allegedly resubmitted the request, adding that he was filing "notice of claim" in "Howard v. Atkins." Id. at ¶52. The plaintiff alleges that five days later, DeBruin returned the request stating that notices of claim are for new cases and the case the plaintiff referenced had already been filed with the court. Id. at ¶53. DeBruin also stated that the mail room would not fill out the certified mail or return receipt and that the plaintiff would need to do that. Id. at ¶53. The plaintiff asserts that when he complained about this second request not being processed, DeBruin "acknowledged that she returned it because she thought he was sending a notice of injury for the case that he had already filed against Dr. Atkins but added that it would have been returned anyway because the plaintiff had not filled out the postal forms." Id. at ¶55. The plaintiff alleges that the same day he received the second request back— April 16, 2019—he submitted a third request which included a description of the filing and the postal forms but that he forgot to sign the disbursement. Id. at ¶56. DeBruin allegedly held on to it for three weeks before sending it back. Id. at ¶57. When he complained about that, DeBruin allegedly said that the mailing had been misplaced. Id.

Seventh, the plaintiff alleges that in April 2019, DeBruin brought to his cell for him to sign a proposed agreement to settle one of his federal cases. Id. at ¶58. The plaintiff signed it and, he alleges, DeBruin left with the only copy (he assumes she was going to forward it to the Attorney General's Office or the

plaintiff's appointed counsel). Id. The agreement allegedly required the DOC to forward funds to the plaintiff's attorney and to cancel the plaintiff's legal loan debts from his trust account. Id. On April 19, the defendants allegedly removed legal loan obligations of $98.27 from his account. Id. The plaintiff asserts that on May 21, 2019, he submitted a legal loan application for a *certiorari* filing to challenge a complaint against the business office, but that despite a statutory forty-five-day deadline, DeBruin did not approve the application until June 6, 2019. Id. at ¶59. The plaintiff states that on June 7, 2019, he submitted a disbursement for postage and a certified copy of his trust account statement, but that DeBruin took another ten days to process it. Id. The plaintiff says that when the settlement reached his attorney, the plaintiff allegedly asked her to send him $850 but the business office was intent on keeping him destitute for as long as possible by refusing to deposit the attorney's check while also delaying his request for legal loans. Id. at ¶60.

Eighth, the plaintiff alleges that in May 2019, he submitted a legal loan application for his brief in Court of Appeals Case Number 18AP1780. Id. at ¶61. The plaintiff states that when he did not hear back, he submitted a disbursement to the librarian for a legal loan and she informed him that he did not have approval for a legal loan for that case. Id. The plaintiff allegedly asked her to call the business office and ask about the status of his application and DeBruin told her that it had not been approved. Id. at ¶62. The plaintiff explains that because the check from his attorney had not been deposited, he didn't have the money to print out his brief. Id. He alleges that on June 26,

2019, he submitted another request to the librarian to have his brief printed and he again was unable to have it printed out because he didn't have money in his account and his legal loan application had not been processed. Id. at ¶63. The plaintiff asked the librarian to call the business office and ask if the copies could be charged as an overdraft, to be paid once the attorney's check was deposited; the plaintiff says DeBruin "refused to accommodate him and he was unable to meet the deadline for his brief." Id.

The plaintiff states that he filed multiple complaints about the delay in depositing his attorney's check and that Eiting replied that the business office could not deposit it until they had a copy of the settlement agreement (which contained a stipulation that restitution would be collected from any settlement funds deposited into his account, per his judgment of conviction). Id. at ¶64. The plaintiff states that when the check still hadn't been deposited by the first week of July, he filed a complaint. Id. at ¶66. He says that DeBruin told the complaint examiner that they had received a settlement check from the attorney, but they needed confirmation about the case number before they could process it because the settlement agreement required that they deduct restitution first. Id. at ¶66. DeBruin allegedly deposited the check on July 26, 2019, after the plaintiff had filed yet another complaint. Id. at ¶67. The plaintiff states that in the meantime he had borrowed money from his family to print his brief, which he submitted to the business office on July 26, 2019 in order to meet the filing deadline. Id. at ¶68. DeBruin allegedly did not mail out the brief until August 4, 2019. Id.

Ninth, the plaintiff alleges that he wrote to the Western District clerk to purchase a copy of a settlement agreement and the clerk sent him a form which had the plaintiff's name, the case number and a description of the document; the clerk's office told the plaintiff that at $0.10 a page it would cost $1.80. Id. at ¶69. The plaintiff states that he placed the form and a postage prepaid envelope addressed to the court, and a disbursement requesting that a $1.80 check be made payable to the Clerk of Court. Id. The plaintiff states that Dinse returned the envelope and disbursement with a note stating that they needed to verify where he was getting the copies from. Id. at ¶70. The plaintiff allegedly resubmitted his request and highlighted the portion of the disbursement containing the court's address. Id. Dinse allegedly returned the submission a second time with a note asking if the plaintiff had the top part of the form sent by the court showing how much copies cost. Id. at ¶71. The plaintiff states that he submitted his request a third time and highlighted the part of the form that stated the cost of the copies. Id. at ¶72. Dinse allegedly returned the envelope and disbursement a third time with no note; she just simply refused to process it. Id. at ¶73. When the plaintiff filed a complaint, Dinse allegedly told the complaint examiner that the disbursement had been returned because they needed more information. Id.

Tenth, the plaintiff alleges that he received a false positive "UA" (urine analysis) drug test. Id. at ¶74. He says he was told he could have the sample sent to the lab for more accurate testing and that he would need to pay for it but he would be reimbursed if the test came back negative. Id. The plaintiff

13

alleges that on January 19, 2020, he signed a disbursement for $10.50 to pay for the retest. Id. He says that on February 1, 2020, the retest came back negative but that DeBruin charged his account $10.50 (which caused the plaintiff to default on a purchase he'd made from an outside vendor). Id. at ¶75. The plaintiff alleges that he repeatedly wrote to Eiting and Dinse asking them to reverse the charge but that they failed to do so, stating that the charge was for the initial UA test, not the retest. Id. at ¶76. He states that the charge finally was credited back to his trust account on March 4, 2020. Id. The plaintiff also says that later that month, he submitted a disbursement to the business office to buy some items being sold by the institution property department, but that Dinse returned the disbursement on the basis that it needed to be verified by staff, even though there had been no verification rule in effect when the plaintiff submitted the request. Id. at ¶77.

    4. *Claims*

   The plaintiff claims that Eckstein and Radtke violated his rights under the First Amendment by approving and allowing the policy and custom of (1) collecting his restitution at the rate of 50% starting in 2018 based on a fictitious judgment of conviction, and (2) retaliating against any incarcerated individual who complained or filed lawsuits against the DOC. Id. at ¶78. The plaintiff claims that Monfils and DeBruin violated his First Amendment rights when they conspired with each other to implement the February 2018 policy of collecting restitution at the rate of 50% and by lying to the institution complaint examiner about receiving an amended judgment of conviction. Id. at

¶79. The plaintiff claims that Eiting, DeBruin, Dinse and Pedersen violated his First Amendment rights when they repeatedly implemented the 50% policy against him over 100 times. Id. at ¶80. The plaintiff claims that Eiting, DeBruin and Dinse violated his First Amendment rights when they repeatedly implemented the retaliatory policy of delaying and/or refusing to process his requests. Id. at ¶81.

In addition to the alleged constitutional violations, the plaintiff claims that the defendants violated his rights under state law. Specifically, he claims that Eckstein, Radtke, Eiting, Dinse, DeBruin and Pedersen made over 100 improper and illegal deductions from his trust account by collecting restitution from all sources at the inflated rate of 50%. Id. at ¶84. He claims that they breached their state and common law duties when they: (a) repeatedly ignored the lawful order of the sentencing court and seized more than 25% of state pay and 50% of gifted funds resulting in the illegal diversion of several hundred dollars from his trust account; (b) applied the 2016 amendment of DAI Policy 309.45.02 to his accounts fully aware that it had not been lawfully implemented pursuant to Act 21 and WAPA; (c) failed to inform the plaintiff that the policy had not been lawfully implemented; (d) failed to comply with the order of the *certiorari* court after February 16, 2018 based on a fictitious judgment of conviction; and (e) failed to inform the plaintiff that the DOC had not been given the authority to set the rates of collection for non-restitution obligations. Id. at ¶85.

The plaintiff seeks injunctive and declaratory relief as well as nominal, compensatory and punitive damages. Id. at p. 19.

C.    Analysis

To plead a retaliation claim, the plaintiff needs to allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." Perez v. Fenoglio, 792 F.3d 768, 783 (7th Cir. 2015) (quoting Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009)).

The plaintiff alleges that the defendants' first retaliatory act took place in February 2018 when they conspired to disregard the Dane County Circuit Court's *certiorari* order and reverted to collecting the plaintiff's restitution from all sources at a rate of 50%. Dkt. No. 7 at ¶22. The plaintiff alleges:

> Upon information and belief, Defendants Monfils and DeBruin conspired and agreed to revert back to collecting 50% based upon a fictitious amended [judgment] to retaliate against him for successfully challenging the DOC as it completely negating the ruling after two weeks [sic].
>
> Upon information and belief, this policy could not have been implemented without the knowledge and consent of Trustees Eckstein and Radtke. Based upon this retaliatory policy, between 2018 and 2021, there were over (100) improper deductions of restitution collected from the Plaintiff's trust account.
>
> Upon information and belief, Defendants Eiting, DeBruin, Dinse and Pedersen were aware that the policy was based upon a fictitious JOC and not only approved of the retaliation but also personally participated in the improper deductions.

Dkt. No. 7 at ¶¶26-28.

16

The plaintiff's filing of a *certiorari* petition challenging the decision he received on his ICRS complaint constitutes an activity protected by the First Amendment and satisfies first element for stating a retaliation claim. See Douglas v. Reeves, 964 F.3d 643, 646 (7th Cir. 2020) (citations omitted).

As for the second element, the court applies an objective test: whether the defendants' alleged conduct would likely deter a person of ordinary firmness from continuing to engage in protected activity. Id. (quoting Surita v. Hyde, 665 F3.d 860, 878). Whether retaliatory conduct is sufficiently severe to deter is generally a question of fact, although the court may resolve the issue as a matter of law when the asserted injury is truly minimal. Id. at 647 (citing Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)). The court assumes that the plaintiff has satisfied this element based on his allegation that beginning in March 2018, the defendants unlawfully took 50% of his state pay.[2]

---

[2] The court notes that the plaintiff's allegation that the defendants relied on a "fictitious" judgment of conviction does not withstand scrutiny. On the same date the plaintiff filed his amended complaint, he filed a motion for preliminary injunction and exhibits. Dkt. Nos. 8, 8-1. In his motion, the plaintiff acknowledges that when defendants reverted to collecting 50% starting in March 2018, "the defendants were relying on preprinted language that was added to an amended JOC issued in 2017 which tracked with a recent change in law, which the sentencing court had already deemed 'surplusage.'" Dkt. No. 8 at 2. The amended judgment of conviction from State of Wisconsin v. Joshua Howard, Milwaukee County Case No. 2004CF2137, is dated February 7, 2017, and contains language that authorizes the DOC to collect, from the plaintiff's wages and from other monies held in the plaintiff's account, "an amount or percentage which the department determines is reasonable for restitution to victims." Dkt. No. 8-1 at 16. The defendants allegedly used this preprinted language from the plaintiff's February 2017 amended judgment of conviction (which is based on Wis. Stat. §973.20(11)(c) ("Act 355")) to collect up to 50% of the plaintiff's funds. As the plaintiff acknowledges in his motion for preliminary injunction, while the defendants reduced the plaintiff's withdrawals to 25% after the *certiorari* order, they increased the withdrawals back to 50% based on

But the plaintiff has not alleged that the filing of his *certiorari* petition was a motivating factor in the defendants' actions to collect his court charges at 50%. The defendants already were collecting restitution at 50% when the plaintiff filed his *certiorari* petition; they decreased the collections to 25% for one month and then, based on their interpretation of the amended judgment of conviction, they reverted to 50%. (The plaintiff states that the defendants implemented a policy of collecting funds in this manner, so presumably they did this with other incarcerated individuals, not just the plaintiff.) The plaintiff has not explained why he believes the defendants' decision to collect at the higher rate was due to his protected activity. He has not stated a retaliation claim. See Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009); Dorsey v. Williams, No. 21-1858, 2022 WL 337192, at *1 (7th Cir. Feb. 4, 2022) (dismissal of retaliation claim at screening stage appropriate where plaintiff failed to allege connection between speech and adverse conduct).

The plaintiff's "subsequent retaliatory conduct" allegations are based on his allegations that Eiting, Pedersen, DeBruin and Dinse implemented "an unconstitutional policy and custom of retaliating against litigants by delaying, denying and/or losing their submissions whenever it was possible for them to do so" and that Radtke and Eckstein were aware of the unconstitutional practice of the business office and allowed it to proceed. Dkt. No. 7 at ¶¶31-32. The plaintiff states that the defendants engaged in the practice of delaying and

language in the amended judgment of conviction that arguably supports their actions (although the plaintiff contends that they unlawfully relied on the language in his judgment of conviction).

18

denying every request that he sent to the business office "in retaliation for his repeated complaints and lawsuits against the DOC." Id. at ¶30.

Filing complaints and lawsuits constitutes First Amendment protected activity. See Douglas, 964 F.3d at 646. The plaintiff's allegations that the defendants engaged in the practice of delaying and denying every request he sent to the business office in retaliation for his "repeated complaints and lawsuits" satisfies the first element of a retaliation claim.

The plaintiff describes conduct that occurred from October 2018 until April 2020. Allegations of ongoing delay and harassment may satisfy the second element of a retaliation claim. See Bridges, 557 F.3d at 552 (delays in incoming and outgoing mail and other forms of harassment by prison officials could be a deprivation serious enough to support retaliation claim). Construed liberally, the plaintiff's allegations of the ten acts of delay, denial and/or harassment from the business office satisfy this standard.

Regarding the third element, the plaintiff has not described why he believes the defendants' conduct was in retaliation for the lawsuits and grievances he filed. Without this causal link that the defendants acted because of the plaintiff's First Amendment protected activity, the plaintiff may not proceed on a retaliation claim. See Bridges, 557 F.3d at 546; Dorsey v. Williams, No. 21-1858, 2022 WL 337192, at *1 (7th Cir. Feb. 4, 2022) (dismissal of retaliation claim at screening stage appropriate where plaintiff failed to allege connection between speech and adverse conduct).

Finally, the plaintiff's state law claims relate to his allegations that the defendants violated the law by deducting 50% of his funds for restitution and other charges. Because the court has concluded that the complaint does not state a federal claim, the court will not exercise supplemental jurisdiction over any state law claims the plaintiff may have stated in the amended complaint. See 28 U.S.C. §1367(c)(3); Lavite v. Dunstan, 932 F.3d 1020, 1034-35 (7th Cir. 2019).

The court will give the plaintiff an opportunity to file a second amended complaint. The court is enclosing a copy of its amended complaint form. The plaintiff must use this form for his second amended complaint. See Civil L.R. 9(b). (E.D. Wis.). The plaintiff must write the word "Second" above the words Amended Complaint; he must list the case number for this case on the first page; he must list all the defendants he wants to sue in the caption of the amended complaint. He should use the spaces on pages two and three to explain the key facts that give rise to the claims he wishes to bring, and to describe which defendants he believes committed the violations that relate to each claim. If there is not enough space on those pages, the plaintiff may use up to five additional sheets of paper, double-spaced so that the court can read them. The second amended complaint takes the place of the prior complaint and must be complete in itself; the plaintiff may not refer the court or other readers back to facts in the previous complaint.

When writing his second amended complaint, the plaintiff should provide the court with enough facts to answer the following questions: 1) Who violated

his constitutional rights?; 2) What did each person do to violate his rights?; 3) Where did each person violate his rights?; and 4) When did each person violate his rights? The second amended complaint does not need to be long or contain legal language or citations to statutes or cases, but it does need to provide the court and each defendant with notice of what each defendant allegedly did or did not do to violate his rights.

If the plaintiff files a second amended complaint, the court advises him that while multiple claims against a single party are fine, he cannot bring unrelated claims against different defendants in the same case. George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007); Fed. R. Civ. P. 18(a) and 20(a)(2). A plaintiff may join multiple defendants in a single case only if the plaintiff asserts at least one claim against each defendant that arises out of the same events or incidents and involves questions of law or fact that are common to all the defendants. Fed. R. Civ. P. 20(a)(2); George, 507 F.3d at 607; Wheeler v. Wexford Health Sources, Inc., 689 F.3d 680, 683 (7th Cir. 2012) (joinder of multiple defendants in one case "is limited to claims arising from the same transaction or series of related transactions").

## II.     Motion for Preliminary Injunction (Dkt. No. 8)

The plaintiff has filed a motion for preliminary injunction requiring the defendants to comply with the order of the sentencing court, *i.e.*, that restitution "is to be paid from up to 25% of the defendant's prison wages." Dkt. No. 8 at 5.

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). The purpose of such an injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." Fahenm-El v. Klincar, 841 F.2d 712, 717 (7th Cir. 1988). To obtain a preliminary injunction, the plaintiff has the burden of establishing that: (1) he is likely to succeed on the merits of his claim; (2) he has no adequate remedy at law; and (3) he is likely to suffer irreparable harm without the injunction. Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health, 699 F.3d 962, 972 (7th Cir. 2012) )citing Am. Civil Liberties Union of Ill. v. Alvarez, 679 F.3d 583, 589-90 (7th Cir. 2012)).

In the context of litigation by incarcerated persons, the scope of the court's authority to issue an injunction is circumscribed by the Prison Litigation Reform Act ("PLRA"). Westefer v. Neal, 682 F.3d 679, 683 (7th Cir. 2012). Under the PLRA, preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. §3626(a)(2); see also Westefer, 682 F.3d at 683 (noting the PLRA "enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: prisons officials have broad administrative and discretionary authority over the institutions they manage") (internal quotation marks and citation omitted).

The court did not allow the plaintiff to proceed on his retaliation claim based on allegations that the defendants have unlawfully taken too much money from his account. The court will deny the plaintiff's motion for preliminary injunction based on these allegations. If the plaintiff disagrees with the DOC's interpretation of his amended judgment of conviction, he may be able to enforce the *certiorari* order by filing a petition for a writ of mandamus in the circuit court. <u>See</u> <u>State of Wisconsin ex rel. Joshua Howard v. Kevin Carr</u>, 2018 AP 1780 (March 4, 2021) (denying plaintiff's motion for contempt sanctions against DOC).

## III.   Conclusion

The court **CONCLUDES** that the plaintiff's amended complaint fails to state a claim. Dkt. No. 7.

The court **ORDERS** that the plaintiff may file a second amended complaint that complies with the instructions in this order. If the plaintiff chooses to file an amended complaint, he must do so in time for the court to *receive it* by the end of the day on **August 18, 2023**. If the court receives a second amended complaint by the end of the day on August 18, 2023, the court will screen the second amended complaint as required by 28 U.S.C. §1915A. If the court does not receive either a second amended complaint or a request for more time to file one by the end of the day on August 18, 2023, the court will dismiss this case based on the plaintiff's failure to state a claim in his amended complaint and will issue him a strike as required by 28 U.S.C. §1915(g).

The court **DENIES** the plaintiff's motion for preliminary injunction. Dkt. No. 8.

Dated in Milwaukee, Wisconsin this 19th day of July, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**